1. A husband is not relieved of liability to comply with an order for the payment of alimony merely because he has no property, and is not employed; but his ability to labor and his opportunity to find employment should also be considered.
2. That a man is mentally and physically disqualified for military service, and for this reason has been rejected by the military authorities, does not show conclusively that he is so incapacitated that he may not earn something for the support of his wife and infant child; and this is true although it may also appear that he is not able to work regularly or to do "a full day's work" at any one time.
3. Where, as a reason for failure to pay alimony as ordered, the husband claims that he is unemployed and can find no employment, his diligence in seeking employment will ordinarily present an issue of fact for determination by the trial judge.
4. In the instant case the evidence did not show conclusively and as a matter of law that the defendant was unable to comply with the order requiring him to pay $2.50 per week as temporary alimony for his wife and infant child; and consequently the judgment holding him in contempt can not be disturbed by this court.
5. In connection with the foregoing rulings, see Scruggs v. Scruggs, 184 Ga. 853 (193 S.E. 865); Huddleston v. Huddleston, 189 Ga. 228 (5 S.E.2d 896); Reese v. Reese, 189 Ga. 314 (5 S.E.2d 777; Burkhalter *Page 305 
v. Burkhalter, 189 Ga. 344 (6 S.E.2d 299); Snider v. Snider, 190 Ga. 381 (9 S.E.2d 654); Boyett v. Boyett, 192 Ga. 604 (15 S.E.2d 871).
Judgment affirmed. All the Justicesconcur.
 No. 14367. JANUARY 14, 1943.
In an action for divorce by a husband, the wife, hereinafter called the plaintiff, filed a cross-action for alimony.
On May 30, 1942, the judge entered an order allowing $2.50 per week as temporary alimony for the wife and her infant child. On July 10, she filed a petition alleging that the husband, hereinafter referred to as the defendant, had not paid one penny for the support of his wife or for "the support of his own child," and praying that he be attached for contempt. The defendant filed a response, contending that he was unable from his poverty and physical infirmity to pay anything as alimony, and disclaiming intentional disobedience of the court's order. After evidence pro and con, the judge issued an order holding the defendant in contempt, and to this judgment he excepted.
The evidence was substantially as follows:
The plaintiff testified: "I am Mrs. Bonnie S. Arnold, the wife of Ben F. Arnold. We have a little baby that will be two years old in September. My husband forced me and the baby to leave him in June, 1941. I had to leave, because he said I could not eat another meal in the home where we were living with my husband's parents. I tried to get him to get us a place where he, the baby, and I could live apart from his people; but he would not do this. He took care of the baby and me all right until he forced us to leave. Since then we have lived with my father. My father worked for the county, and makes $30 per month. I have tried to get all the work I can, and am working part time at the school lunch-room in Forsyth. I leave my baby in order to work. All that my husband has done for his baby since I had to leave was to give the baby three dresses. He has not provided anything for me or the child to eat. . . I am not so much concerned about any support for myself, but I do think he ought to support his child. All he has done since June, 1941, toward the support of the child is to give the child three dresses. During this time he has been keeping up an automobile, and working on the farm, and running a small store and a dance-hall. He always had money to *Page 306 
buy what we needed before I was forced to leave him. My husband was ordered to pay alimony of $2.50 per week on May 30, 1942. He has not paid one cent since then. On the first day of August, 1942, we had a hearing before Judge Persons, about his failure to pay anything. At that time Judge Persons postponed any ruling in the case for four weeks, so that my husband would have plenty of time to do a little something for his baby. Between August 1, 1942, and to-day (August 29, 1942), he has not done one thing for the baby, and I have not even heard from him during that time. He is able to work, and he could do something for his baby if he wanted to. He may not have any property, but I don't have any either. He is truck farming and doing other things, such as running the store and looking after the cows. He always told me that he and his father owned the cows together. Of course, that is all I know about who owned the cows — just what he says."
The defendant testified: "I married Bonnie Smarr on September 24, 1939, and she quit me the latter part of June, 1941, on her own free will and accord. I did a lot toward supporting my child until my wife brought this alimony suit against me in Monroe County. She did not bring it in Monroe County until after I sued her for divorce. Until then I furnished the baby all the clothes she needed. What my wife says about me furnishing three dresses only is not true. At one time, after our separation, I gave her $5 that I got from my father, in a store in Macon, Georgia, for the baby. I sent many playthings to the baby — sent them to Mr. Smarr's home in Monroe County, where the baby and my wife were living. I gave the baby other things. I would take care of the baby now if I had the baby with me. I have been running a truck-farm. I run a truck-farm now. I owe for the guano that went into the farm. I have been helping my father run a store, and last summer I helped run a dance-hall. This summer we have not run the dance-hall, because people do not go about very much.
"As to my health and whether I can work or not, it is true that in filling out my questionnaire for the army I swore that my father and mother were dependent upon me, that I was the only one that was able to do the truck farming, and that they could not look after the store and cattle without me. I swore that they were dependent upon me. I did not say anything about my wife and child being dependent upon me. I just left them out. During *Page 307 
the last four weeks since we had the first hearing in this matter on my failure to pay anything for the support of my wife and child, in which Judge Persons said for me to see if I could not find something to do, I have tried at two places close to where my father lives. These two places operated dairies, and the owner of each place said he could not give me a job. I have not been away from home looking for a job — just these two places close by. . . She quit me and left the latter part of June, 1941, on her own free will and accord. We lived with my father, B. H. Arnold, in his home, in Bibb County, Georgia. He furnished us board and lodging until she left me with the baby and went to her father's home in Monroe County.
"I have no property, no real estate and no personal property, and no money. I am unable to do a full day's work, and I can't get a job. I help my father on the truck-farm. He pays me nothing, except he furnishes me board and lodging. When my baby was born, my father paid the doctor's bill. My father furnished board for me, my wife and baby after it was born, free of charge. The only way I could pay him was what little work I could do in the truck-farm and help him with the cattle. I have no money to pay my wife, and can't get any money. I am not physically able to do a full day's work.
"I was, on the 22d day of June, 1942, sent to the U.S. Army headquarters at Fort McPherson. I was there examined, and found to be unfit for any kind of military service, was placed in Class 4-F, and sent home to stay. I have bad eyes, high blood-pressure, and bad teeth, and have headaches often. Class 4-F means I am mentally and physically unfit for any kind of military service. I am not trying to get out of paying my wife alimony. I have not the money and no way to get it. I can not borrow any money. I have nothing to borrow it on."
B. H. Arnold testified: "Ben F. Arnold is my son. He has lived with me all of his life. He is twenty-six years of age. He married Bonnie Smarr on the 24th day of September, 1939. He ran away and got married to Bonnie Smarr. He did not tell me about it. He borrowed five dollars from me the day before he married. After he married he brought his wife to my home. I took both of them in my home, just like a member of my family. I did not charge them any board. I live in Bibb County. I am *Page 308 
a renter. I rent land from Mrs. Fuller of Macon, Georgia. I have no property, either real or personal, except I have some cattle. I operate a truck-farm. My son helps me. He is physically unable to do a full day's work. He has never been strong. I do not pay him any salary. I furnish him board and lodging for his help on the truck-farm and in looking after the cattle; furnished board and lodging for his wife and child until she, Bonnie S. Arnold, deserted her husband the latter part of June, 1941, moved out with her child without any cause. She went to her father's house, near Strouds in Monroe County. She went away of her own free will and accord.
"I am not able to feed his family, but I did the best I could. I am not well myself. I have been sick for a long time. I had a serious operation in the hospital in Macon, Georgia, and have never been well since. My wife is almost an invalid, and has been for a long time. My son, Ben F. Arnold, has always been puny, and he has not been able to do a full day's work in three or four years. He was called to the army, through the local draft board in Forsyth, Monroe County, Georgia, sent to Fort McPherson in June, 22d day of June, 1942. There he was examined and sent back home. He was classified in class 4-F. This means that he is physically and mentally unfit for army service. My son, Ben F. Arnold, has no property, either real or personal. He has no property of any kind. I have supported him through all these years, supported him and his wife for around twenty-one months. I paid the doctor's bill when his child was born. He had no money. He works for me enough to just about pay for his board. He is unable to work regular. He has always been sickly."
The defendant introduced report of examination made of him by E. R. MacLennan, medical corps, at Fort McPherson on June 23, 1942. In this report the examiner certified, "that the above-named registrant was carefully examined; that the results of the examination have been correctly recorded; and that to the best of my knowledge and belief he is mentally, physically, disqualified for the military service of the United States, by reason of mental deficiency . . . The above named registrant was this date, 6-23-42, rejected for service of the army in the United States." Also introduced was a section of "United States Selective Service Manual," showing the meaning of the classification of a draftee classed *Page 309 
in 4-F, as follows: "(1) After physical examination by the examining physician, is found to have a defect set forth in Part I of the list of defects. . . (2) After physical examination by the armed forces, is found to be physically or mentally unfit for any military service, by reason of a defect which can not be remedied so as to make the registrant fit for either general or limited military service."