STATE ex rel. HOUTCHENS, Relator v. DISTRICT COURT of FOURTH JUDICIAL DISTRICT in and for RAVALLI COUNTY et al., Respondents.

No. 8837.
Submitted September 16, 1948. Decided November 5, 1948.
199 Pac. (2d) 272.

78

Dan A. Paddick, of Hamilton, for appellant. Mr. Paddock argued the cause orally.

Koch & Brownlee, of Hamilton, for respondent. Mr. Koch and Mr. Brownlee argued the cause orally.

MR. CHIEF JUSTICE ADAIR:

This is an application for a writ of certiorari to review the action of the district court in committing relator, hereinafter called plaintiff, to jail for contempt in disobedience of an order compelling him to pay certain sums as alimony pendente lite, suit money, medical expenses and counsel fees in the pending divorce action brought by relator, John Houtchens, plaintiff, against his wife, Edith Houtchens, defendant.

January 30, 1948, the court made an order that plaintiff pay to defendant as alimony pendente lite $50 per month; for doctor's services furnished the infant daughter of the parties $100; for transportation from California where defendant then was to Montana where the suit is pending $113.90, and for counsel fees $150, of which $75 was to be paid immediately and the balance of $75 at the commencement of the trial of the action.

Plaintiff failed to pay any of the sums awarded and on February 4, 1948, the court ordered that the money be paid on or before February 11, 1948, or that plaintiff show cause why it had not been paid.

No part of the money was paid and on February 11, 1948, after hearing had and testimony taken, the court expressly found ''from the testimony submitted that the plaintiff is able to make certain payments for the support of the minor child

of plaintiff and defendant and to pay certain medical charges for said child'' and thereupon ordered that he forthwith pay; $100 for doctor's services rendered the infant; $100 for support of the mother and child for the months of January and February, 1948, and that on the first Wednesday of each month thereafter, commencing with March, 1948, plaintiff pay $25 per month toward the support of his wife and child.

Again plaintiff failed to pay any of the sums awarded and on April 21, 1948, on accusatory affidavits so charging, plaintiff was ordered to show cause why he should not be adjudged guilty of contempt and punished for willfully disobeying the aforesaid court orders.

On May 14, 1948, after hearing had, the court made an order reciting that it ''finds from the evidence that the plaintiff has not complied in any way with said orders, and has not paid any of the sums or amounts of money which the Court ordered to be paid; and the Court further finds that plaintiff is able to do so.'' Thereupon the court adjudged plaintiff guilty of contempt for failure to obey its orders of January 30, 1948, and of February 11, 1948, but further ordered that he may purge himself by paying a total of $175 to the clerk of the court before noon of May 21, 1948, ''and if not so paid by that time the plaintiff shall be committed to the County Jail of Ravalli County until there has been a compliance with said order dated February 11, 1948.''

Plaintiff failed to pay any part of the sum awarded but on application made was granted a stay of execution of the judgment for one week to enable him to apply to this court for a writ of certiorari.

On May 28, 1948, the stay having expired, the trial court ordered plaintiff's arrest and that he forthwith be confined in jail until he pays to the clerk of said court, the sum of $175 for the benefit of his wife, unless further ordered by the court.

On the making of the latter order plaintiff's counsel promptly paid to the clerk of the court the sum of $175 as ordered and thereby did plaintiff escape incarceration. Upon the pay-

ment of the money to its clerk the court ordered that the clerk hold same pending the outcome of this proceeding.

The question here presented is: Did the district court have jurisdiction to make the order committing plaintiff to the county jail until he pays the $175 as directed?

It is conceded that plaintiff did not pay any part of the sums awarded prior to the making of the court's order of May 28th directing that he be forthwith arrested and imprisoned.

Section 9918, Revised Codes of Montana, 1935, provides: "When the contempt consists in the omission to perform an act which is yet in the power of the person to perform, he may be imprisoned until he shall have performed it, and in that case the act must be specified in the warrant of commitment."

Plaintiff concedes that if it be within his power to pay the sums ordered, jurisdiction is conferred upon the trial court by section 9918, supra, to order his imprisonment until he pays the sums awarded, but, as a defense, he urged that he lacks the ability to pay the sums ordered and that for such reason the provisions of section 9918 are wholly inapplicable to his case and that thereby the court is divested of jurisdiction to either make or enforce its order of commitment.

*Ability to Pay.* After numerous hearings and careful consideration of much testimony the court repeatedly found that plaintiff had and has the ability to pay the various sums ordered.

As a basis for the making of its order of January 30, 1948, ██ directing that plaintiff should pay the specific sums ordered, it must be presumed that the court first determined that plaintiff then had the ability to pay the award. State ex rel. Nixon v. Second Judicial District Court, 14 Mont. 396, 40 Pac. 66.

In its order of February 11, 1948, the court made an express finding that plaintiff was then able to pay the sums awarded.

The orders of January 30th and of February 11th requiring ██ the payment of alimony pendente lite, suit money, doctor's bills and counsel fees are appealable orders. State

ex rel. McGrath v. District Court, 82 Mont. 463, 267 Pac. 803. Intermediate judgments requiring the payment of alimony pendente lite in actions for divorce constitute final judgments as to the matters therein and thereby determined. Ringling v. Biering, 83 Mont. 391, 396, 272 Pac. 688. See also In re Finkelstein, 13 Mont. 425, 34 Pac. 847, and State ex rel. Nixon v. Second Judicial District Court, supra, both citing with approval the case of Sharon v. Sharon, 67 Cal. 185, 7 Pac. 456, 635, 8 Pac. 709.

Plaintiff took no appeal from the order of January 30th nor from that of February 11th and he may not have either reviewed and annulled on writ of certiorari. State ex rel. Lay v. District Court, Mont., 198 Pac. (2d) 761; State ex rel. Gattan v. District Court, 39 Mont. 134, 136, 101 Pac. 961; State ex rel. Wilson v. Kay, 164 Wash. 685, 4 Pac. (2d) 498.

In its order of May 14, 1948, the court specifically found that on that date plaintiff had not complied in any way with its orders; that he had not paid any of the sums ordered to be paid and "that plaintiff is able to do so."

In its order of May 28, 1948, the court found that plaintiff had not paid any of the sums awarded and "that plaintiff was well able to do so."

There is sufficient substantial evidence in the record tending to establish the ability of plaintiff to pay the various sums as ordered and to sustain the court's repeated findings that he had and has such faculty. With such evidence before it the court was acting within its jurisdiction and within the authority conferred by section 9918, Revised Codes of 1935, in adjudging plaintiff guilty of contempt and in ordering that he be committed to the county jail until there has been a compliance with the court's order of February 11, 1948.

It was not necessary for the wife to show the husband's ability to pay to warrant adjudging him in contempt. Lack of ability to perform is a defense to be advanced and to be proved by the accused and a prima facie case of contempt was established by merely showing the orders of January 30th

and of February 11th and plaintiff's failure to comply therewith. State ex rel. Murphy v. Second Judicial District Court, 99 Mont. 209, 213, 41 Pac. (2d) 1113. These orders, from which no appeal was taken, have now become final adjudications that plaintiff then had the ability to pay the sums ordered and plaintiff may not, in this proceeding, collaterally attack such orders.

It is the legal as well as the moral duty of a parent to support his dependent offspring (State ex rel. Lay v. District Court, supra) and the law also provides, "The husband must support himself and wife out of his property or by his labor." Sec. 5784, Rev. Codes of Montana 1935. A husband and father owning property may be required to support his wife and children out of such property but should he have no property such fact would not absolve him from his duty to support his family for then he must provide such support "by his labor." Sec. 5784, supra.

Here both plaintiff and his father repeatedly testified that plaintiff has no property. If such testimony be true then "by his labor" sec. 5784, supra, must plaintiff support his family.

Lack of ability to support one's wife and dependent offspring must not be confused with lack of will to discharge such legal, moral and social obligation. Little sympathy can be had for a husband and father who willfully fails and refuses to support his family. The husband is not relieved of liability to comply with the court's orders in that behalf merely because he has no property or because he is not gainfully employed. His ability to perform labor; his opportunity to find gainful employment; his disposition and will to earn money and contribute a reasonable amount to his family's support, and his diligence in seeking employment that will yield, at the very least, sufficient wages to provide for himself and dependents the necessaries of life should also be considered. See Arnold v. Arnold, 195 Ga. 304, 24 S. E. (2d) 12; Reese v. Reese, 189 Ga. 314, 5 S. E. (2d) 777; Huddleston v. Huddleston, 189 Ga. 228, 5 S. E. (2d) 896; Scruggs v. Scruggs, 184 Ga. 853, 193 S.

E. 865; Boyett v. Boyett, 192 Ga. 604, 15 S. E. (2d) 871; Roper v. Roper, 242 Ky. 658, 47 S. W. (2d) 517, 519; Braswell v. Braswell, 198 Ga. 753, 32 S. E. (2d) 773; Burger v. Burger, 196 Ga. 428, 26 S. E. (2d) 615; Hall v. Hall, 185 Ga. 502, 195 S. E. 731; Shepherd v. Shepherd, 201 Ga. 525, 40 S. E. (2d) 382; Gaston v. Gaston, 114 Cal. 542, 46 Pac. 609, 55 Am. St. Rep. 86; Ex parte Spencer, 83 Cal. 460, 23 Pac. 395, 17 Am. St. Rep. 266; Record v. Record, 195 Okl. 289, 157 Pac. (2d) 166; Mathews v. Mathews, 186 Okl. 245, 96 Pac. (2d) 1054, 139 A. L. R. 202; Hulcher v. Hulcher, 177 Va. 12, 12 S. E. (2d) 767; Hawkins v. Hawkins, 187 Va. 595, 47 S. E. (2d) 436.

Inability to comply with an order awarding alimony pendente lite is not established by merely showing that one has no money or property which he might convert into money with which to satisfy the alimony installments. It must be further made to appear clearly that he has in good faith exhausted all the resources at his command and made a diligent and bona fide effort to comply with the order. Reese v. Reese, supra.

The following evidence was given by plaintiff or introduced on his behalf: Plaintiff is a young man skilled and experienced in the dairy business. Continuously for six years past his sole occupation has been assisting his father in operating the latter's large dairy ranch in Ravalli county, Montana. There plaintiff daily milks large numbers of dairy cows ranging from about 40 head in the early spring to as many as 80 head in the summer months. The only other help on the ranch is an elderly "chore boy" who is paid $35 per month. All plaintiff's years have been spent in working for his father. Never has plaintiff worked for anybody else. Plaintiff is a good, efficient and dependable dairy hand. For his work and labor in feeding and milking the cows he receives only his board and room. He receives no wages. His father testified that it is impossible to pay plaintiff any set sum in cash as wages. Other than his board and room the only money that plaintiff received for his labor from September 15, 1947, to February 11, 1948, was the sum of $10. Plaintiff's father testified that if his son should

leave and accept other employment he would have to have an auction sale and quit because without plaintiff he couldn't make it and would lose the ranch and that it would cost anywhere from $75 to $200 a month to hire a man to do the job that plaintiff is doing. If plaintiff were to ask his father for the money to pay for the physician's services in administering to his sick child the father could not give it to him. The labor that plaintiff is performing on the ranch at present, while of assistance to his father, is of no actual benefit to plaintiff personally. Plaintiff has no actual interest of any kind in the ranch. He has only 32¢ left in the bank. He has no other money or property. He works for nothing for his father and pleads that he hasn't any money or means to contribute toward the support of his wife and infant daughter. Besides feeding two families, the ranch has produced sufficient revenue in the past five years to pay over $18,000 on the indebtedness against it, leaving a balance owing of only $17,000. From $300 to $450 worth of milk and cream is produced on the ranch and sold each two weeks. On February 11, 1948, while testifying in plaintiff's behalf, the father exhibited an uncashed check for $451 that day received in payment for the milk and cream produced on his ranch during the preceding two weeks. Plaintiff values the ranch at $65,000 while his father values it at $50,000. Allowing for the unpaid indebtedness against it, the father's equity therein at his valuation would be worth $33,000 and at plaintiff's valuation $48,000.

July 5, 1944, plaintiff and defendant intermarried and moved into the hunting lodge on the father's ranch where they established their home. Two children were born of the marriage,— a son, Johnnie William, born July 19, 1945, and a daughter, Judy Radine, born April 6, 1947. When three months old Judy accompanied defendant to Fontana, in the state of California, being the home of defendant's parents. Plaintiff not only made no attempt to dissuade defendant from going to California but he purchased her bus and railroad tickets and supplied her with the money that enabled her to take the trip. On the

day she departed, July 17, 1947, plaintiff drove her and the baby to the depot at Hamilton, Montana, and started them on their way. Defendant had made two previous visits to California at plaintiff's expense. On each of such trips plaintiff had supplied his wife with sufficient funds to enable her to return home but as to the trip of July 17th plaintiff testified that defendant did not have sufficient money for the return trip as he had given her just "a little over enough to get down there"; that this was all the money he had but that had he had it he would not have given her more.

By letter dated July 22, 1947, defendant advised plaintiff of the safe arrival of herself and baby at her mother's home. The wife wrote plaintiff a second letter on July 26, 1947. Plaintiff failed to reply to either letter. August 19, 1947, defendant wrote plaintiff a third letter therein stating, inter alia:

"My pride & determination seems different than it was up home under the domineering depression that I went through. Here in California or any other place there is an opportunity for everyone willing to go and work for it. Although you feel you can't live away from home, there is many jobs open for you. * * *

"Milkers are getting $300.00 to $500.00 per month for milking approximately thirty (30) cows.

"There are many ways, Johnie, that you could support us down here if you wanted to. * * *

"The more I see of California, the more I like it and I am sure you would like it if you could see it. So many people run down this state but Honey you have to see it to appreciate it.

"If you would come down and get a job here or any other place so we could be together and live independently, I know with all my heart we could be very happy together. * * *

"As of today you have not fulfilled one promise made to me before my departure.

"You said I wasn't to worry, everything would come out all right, but which way did you mean that, for my benefit or for yours?

"Since I arrived I haven't had one minutes' ease, wondering what could have happened to you and our baby as I haven't heard from you.

"As your wife and mother of your children I believe I should at least have enough consideration for a letter from you and tell me what is on your mind.

"As previously mentioned in this letter, I expect at least this consideration.

"Honey I love you as much as ever, and I know we could be very happy using our own heads and living our own lives for ourselves and our children. This we owe them as parents.

"Our marriage to the day I left home was a one-way proposition. In so far as independence and responsibilities of our own is concerned, I feel you left me out on a limb.

"Mother and daddy are not in a position to support us, Daddy being a disabled veteran of this war. He is not capable of doing hard work as he was before the war. He is constantly seeing a doctor and has been for a year, as a war casualty. * * *"

On October 8, 1947, plaintiff brought suit for divorce against defendant commencing his action in the district court of the first judicial district in and for Broadwater County, Montana. The forum selected is more than 200 miles distant from the family domicile. Plaintiff says he did this because he "desired to avoid publicity in his own county." On October 22, 1947, summons in the action was served on defendant at her parents' home in California. By order made November 6, 1947, the cause was transferred to the district court in and for Ravalli county where it is now pending on the complaint, answer and cross-complaint of defendant and plaintiff's demurrer to the cross-complaint.

Ordinarily where the husband commences the suit for divorce his alleged poverty will not be considered on the theory that if he has not the means to pay the required alimony pendente lite, suit money and counsel fees of his wife, he should not bring the action. See Frickel v. Frickel, 1893, 4 Misc. R.

382, 24 N. Y. S. 483; Norton v. Norton, 1934, 111 Ohio St. 262, 145 N. E. 253; Bickel v. Bickel, 1932, 17 Pa. Dis. & Co. R. 515; Blank v. Blank, 1933, 129 Cal. App. 403, 18 Pac. (2d) 956.

*Plaintiff's Testimony.* Plaintiff testified as follows:

"Q. If you do not make the payments can you retain the ranch? A. We will probably lose it.

"Q. Are you staying current on your payments at the present time on the ranch? A. Well, we have been making them so far but that is about all.

"Q. Do you have any bank balance at all? A. I don't.

"Q. Do you have any separate property out of which you could comply with the terms of this decree? A. No, I don't. * * *

"Q. What do you do, just work for board and room for your father? A. More or less.

"Q. What do you mean, more or less? Be explicit. Do you work for board and room for your father? A. Sure, and my son's.

"Q. Do you get any additional money? A. No. * * *

"Q. How much milk do you sell in the course of a month? What is your cream check, what does it amount to a month? A. I haven't asked him and I don't know, but it is down from what it should be.

"Q. Do you have any estimate? A. No.

"Q. No estimate whatsoever? What do you do on the ranch? A. Help feed the cows and I help do the milking. * * *

"Q. Do you have anything to do with selling the milk? A. Well, when you sell milk at the creamery you get the market price for it.

"Q. You don't know what or how much you get in the course of a month? A. I know what the market price is.

"I don't mean that, I mean the gross receipts over the course of a month would be what? A. It would vary on the amount of your milk.

"Q. You don't know what the gross receipts would be during the month? A. No.

"Q. Can't you give me any figures between which it would run? A. I have no idea. * * *

"Q. You don't know how much the ranch itself is making? A. No.

"Q. All you know is that you milk the cows and your father gives you your board and room, is that right? A. That is about right. * * *

"Q. If your presence were removed from the ranch would it be necessary to hire somebody to replace you? A. Yes, sir.

"Q. How much would that cost? A. Anywheres—Well, you would be very lucky if you got somebody for less than $100.00 a month.

"Q. And board? A. Well, they are paying all prices now. Depends on what they have to do. * * *

"Q. Would it be possible for you to get out and seek other employment? A. No.

"Q. Why? A. We got our ranch to take care of and if I would leave we would probably have to lose it.

"Q. Why is that necessarily true? A. My father isn't able to do too much.

"Q. Since the time of the last hearing in this matter, Mr. Houtchens, how has your health been? A. I wasn't able to do anything for about two or three weeks. I run a pitchfork in my leg and that balled things up worse than ever.

"Q. What was the result of that? That is, did it lay you up? Were your hospitalized? A. I wasn't hospitalized but I couldn't do too much.

"Q. So for the past three weeks there was a complete loss of time by you? A. That is right.

"Q. Has your financial status changed in any manner since the time of the previous hearing? A. No.

"Q. What is your personal financial status at this time? A. I haven't any money. * * *

"Q. Is it 'his' ranch or 'our' ranch, referring to you and your father? A. It is his ranch.

"Q. Mr. Houtchens, were you present in Court on the 11th of February, 1948? A. I was.

"Q. Did you hear the Court make its order on that day in reference to the payments you were to make for the support of your wife and child? A. Yes.

"Q. Have you made any of those payments? A. How can I? I haven't any money.

"Q. Have you made any of those payments? A. No. * * *

"Q. What I am trying to establish, Mr. Houtchens, is whether or not you have an actual interest in that ranch? A. No.

"Q. Then this work you are doing on the ranch at present, while it is to help your father, is of no actual benefit to you personally, is that correct? A. Not at present it isn't.

"Q. So that that is of no actual benefit to you. You are working there for nothing while you haven't sufficient money to pay any support for your wife and child, is that also correct? A. No, I haven't any money to pay her.

"Q. When, if ever, do you think you might have some money to pay for the support of your wife and child? A. I don't know.

"Q. Do you think you ever will? A. Maybe some day.

"Q. Mr. Houtchens, are you deliberately keeping yourself in a sort of poverty so you won't have to make those payments? A. No."

The testimony of plaintiff and his father at times demonstrated considerable lack of frankness and candor; it reveals a number of self-contradictions and attempts at deception in an endeavor to prevent the court from obtaining a true and full picture as to plaintiff's actual financial status. However, there is ample substantial evidence in the record to establish beyond question plaintiff's ability to pay the award. In fact, when the respondent court, weary of the deception that was being practiced upon it, ordered that plaintiff be forthwith

arrested and confined in jail until there had been a compliance with its order, the money was immediately forthcoming, thereby demonstrating plaintiff's ability to satisfy the contempt judgment against him.

Plaintiff may not recover the money so paid to the clerk of court. It was lawfully exacted through the enforcement of a valid court order. Where plaintiff obtained the money is immaterial. The court is not concerned with whether plaintiff borrowed it from his employer, his banker or his lawyer. He has demonstrated his ability to procure the sum required to perform the judicial order and the court was duly empowered to compel such performance. Sec. 9918, Rev. Codes 1935.

Actions for divorce are suits in equity. The power of a court of equity to lay hold of the conscience of a party litigant properly before it and compel him to do that which is right has always been conceded and exercised. The orders and decrees of such courts are enforceable. The order for plaintiff's arrest and confinement exerted the right amount of pressure at the right place to bring plaintiff's actual resources to a practical and decisive test. As was well said by the Supreme Court of Georgia in the case of Lester v. Lester, 63 Ga. 356, 359: "Pressure is a great concentrator and developer of force. Under the stress of an attachment, even the vision of the respondent himself may be cleared and brightened, so that he will discern ways and means which were once hidden from him, or seen obscurely. It is a great help to do a thing to feel that it must be done, and that there is no evading it. * * * In reducing him to the alternative of prompt payment each month or of being attached, the judge has put the respondent on the vantage side of all his resources, whatever they may be." Again in the Lester case, supra, the court said: "Whatever may be the theoretical difficulties of maintaining a family on the labor of one man, with such casual assistance as his wife and young children can afford, practically all such difficulties are overcome so generally that there is a reasonable presump-

tion of the ability of any able-bodied husband and father to contribute something to the support of his wife and each minor child.''

Plaintiff has reached man's estate. He has attained his majority and taken unto himself a wife. He is completely emancipated. Sec. 5841, Rev. Codes 1935. No longer is he tied to his mother's apron strings nor tethered to his father's milking stool. He has a wife and children to support. He cannot provide such support by working gratis for his father. He is entitled to receive adequate wages ''for the labourer is worthy of his hire.'' Unless the hire is forthcoming and the support provided the father stands to lose a most able dairy hand and assistant and the plaintiff must be prepared to suffer the consequences attendant upon his willful failure and refusal to comply with the law and the valid orders of the respondent court. A man under lawful orders of a court in respect to the support of his family has no more latitude than one who does his duty without any order. Lester v. Lester, supra.

The court did not exceed its jurisdiction in making the order of which relator complains.

It is ordered that the writ be discharged, the proceeding be dismissed and that relator pay the costs.

Associate Justices Choate, Gibson, Angstman and Metcalf concur.